UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

| | |
|---|---|
| LIAM POWERS,<br><br>                Plaintiff,<br><br>    v.<br><br>SEATTLE PUBLIC SCHOOL DISTRICT #1, a municipal corporation; TED HOWARD, individually and in his official capacity as Principal of Garfield High School; KATRINA HUNT, individually and in her official capacity as Principal of Garfield High School,<br><br>                Defendants. | CASE NO. 2:21-cv-01160-JHC<br><br>ORDER |

**I.**

**INTRODUCTION**

This matter comes before the Court on Defendants Seattle Public School District #1 ("the District"), Ted Howard, and Katrina Hunt's Motion for Summary Judgment, Dkt. # 20, and Plaintiff Liam Powers' Motion for Partial Summary Judgment, Dkt. # 22. The Court has considered the materials filed in support of, and in opposition to, the motions, and the case file. Being fully advised, and for the reasons below, the Court DENIES Defendants' motion, and GRANTS in part and DENIES in part Plaintiff's motion.

ORDER - 1

# II.

# BACKGROUND[1]

A.   Plaintiff's Pre-Expulsion Conduct at GHS

During the 2017 to 2018 academic year, Plaintiff was a senior at Garfield High School ("GHS"). Dkt. # 54 at 3. Plaintiff enrolled in only one class at GHS, statistics, because he had completed most of his coursework at Seattle Central College through the "Running Start" program. Dkt. # 23-6 at 19. One day in January or February 2018, Plaintiff arrived at Ms. Dinh's[2] statistics class early and began watching videos on his cellphone of "people dying [and] getting killed" in car crashes and industrial accidents. Dkt. # 54 at 8; Dkt. # 24-1 at 2–3. Plaintiff's tablemates David Engal, Miles Jenkins, and Zack Cohen soon arrived, and Plaintiff showed them the videos. Dkt. # 24-1 at 3. Prompted by the videos, the four students discussed a hypothetical school shooting at GHS.[3] Id. Plaintiff asserts that until February 16, 2018, no one spoke to Plaintiff about his comments made in statistics class. Id.

---

[1] The parties do not dispute these facts unless otherwise noted below.
[2] The record does not appear to show Ms. Dinh's first name.
[3] The parties dispute the contents of this conversation. According to Plaintiff, Jenkins told Plaintiff, "[Y]ou look like the kind of kid that would shoot up a school." Dkt. # 24-1 at 3. Plaintiff responded, "[O]h yeah [Jenkins], I'm definitely a school shooter," which drew laughter from his tablemates. Id. Plaintiff mused that "any wacko could just pull the fire alarm and wait on the field and we would be screwed." Id. at 4. Jenkins told Plaintiff "to just kill [himself] instead of shooting up the school," to which Plaintiff responded, "you should be careful [Jenkins], because if I was crazy[,] you would probably be at the top of my list." Id. At the next statistics class, Cohen and Engal teased Plaintiff, calling him a school shooter. Id. at 5.
  The student incident statements later submitted by Jenkins, Cohen, and Engal differ from Plaintiff's version of the conversation. See Dkt. # 23-3 at 1–8. Their statements do not mention that Jenkins accused Plaintiff of resembling a school shooter, that Jenkins told Plaintiff to kill himself, or that the three students teased Plaintiff. Id. They contend that Plaintiff offered that if he ever committed a school shooting at GHS, he would pull the fire alarm and be waiting with a gun as students proceeded to the field. Id.; Dkt. # 54 at 8. Jenkins stated he interpreted Plaintiff's statements as either a joke or a plan to shoot students. Dkt. # 23-3 at 2, 4.

ORDER - 2

Later, on February 14, 2018, a 19-year-old shot and killed 14 students and three staff members at his former high school in Parkland, Florida.[4] On Friday, February 16, 2018, Plaintiff posted the following image to Snapchat, a social media network:



Dkt. # 54 at 10. The image stated, "Screenshot if you think we need more guns." Dkt. # 24-1 at ¶ 21. Behind the text was an image of a cartoon pistol. *Id.* Plaintiff placed a photograph of Zack Hammond, a teammate from Plaintiff's crew team, at the end of the pistol's barrel. *Id.* Plaintiff superimposed a photograph of Hugh Gleystein, another crew teammate, onto the pistol's trigger. *Id.* Plaintiff claims that he intended the Snapchat post to be "sarcastic," "non-serious," and "comical." *Id.*

---

[4] *17 People Died in the Parkland Shooting. Here Are Their Names*, NPR (Feb. 15, 2018), https://www.npr.org/sections/thetwo-way/2018/02/15/586095587.

ORDER - 3

Around 3:15 p.m. on Friday, February 16, Jenkins met with GHS administrators to file an incident statement after viewing Plaintiff's Snapchat post and connecting it to Plaintiff's prior comments in class. Dkt. # 54 at 24; Dkt. # 23-5 at 50–52; Dkt. 23-3 at 2–4. Jenkins asserted that in Ms. Dinh's class, Plaintiff "began to joke/plan [about] shooting up [GHS]" and that Jenkins was "on the top of his 'list' (of people to kill)." Dkt. # 23-3 at 2–4. Jenkins shared his experience with Chelsey Thomas, the school counselor, Katrina Hunt, the assistant principal, and a security officer. Dkt. # 23-5 at 50–52, 55. That afternoon, Principal Ted Howard began to collect more information about Plaintiff in deciding how to proceed.[5] Thomas shared with Howard that Plaintiff visited her over the past five months and that he was "really, really angry," in part because of a domestic dispute with his father. Dkt. # 23-5 at 9 ("He had been in a situation where his dad had thrown him down a flight of stairs.").

Principal Howard decided to call the Seattle Police Department ("SPD"), and law enforcement officers arrived at GHS soon after to interview students. Dkt. # 23-5 at 5. SPD instructed GHS administrators not to contact Plaintiff or his parents until SPD had finished their initial investigation. Dkt. # 54 at 41, 64. Because Plaintiff was not at school on February 16 due to illness, SPD spoke with Plaintiff at his residence. Dkt. # 24-1 at ¶¶ 20, 22. Plaintiff told the officers that his prior statements were jokes, but SPD arrested him and booked him into juvenile detention for felony harassment until he was released to his parents later that evening. Dkt. # 54 at 69, 75–79. The following Tuesday, February 20, 2018, during GHS's week-long midwinter break, Principal Howard distributed a letter to the GHS community informing them that SPD had

---

[5] Defendants contend that on February 16, GHS administrators interviewed multiple students about Plaintiff's alleged threats. Dkt. # 20 at 6–8; Dkt. # 28 at 3; Dkt. # 54 at 19. Plaintiff counters that GHS administrators interviewed only Jenkins on February 16, while other students submitted their statements on February 26. Dkt. # 26 at 14; Dkt. # 23-1 at 63–64.

ORDER - 4

arrested a student the past Friday for "making threats to harm fellow classmates at an unspecified time in the future." Dkt. # 20-3 at 2. The letter did not name Plaintiff. *Id.*

B.     Emergency Expulsion[6]

On Thursday, February 22, Hunt mailed the Notice of Disciplinary Action ("NDA"), a document identifying Plaintiff's emergency expulsion, to Plaintiff's residence. *Id.* at 59–60; Dkt. # 23-3 at 10–11. The same day, Hunt called Plaintiff's mother, Kristin Greimel, to inform her that GHS had emergency expelled Plaintiff.[7] Dkt. # 54 at 61; Dkt. # 25 at ¶ 2. Greimel informed Hunt that Plaintiff had retained counsel and that all District and GHS communications about Plaintiff's expulsion must be directed to his attorney. Dkt. # 54 at 58, 65. Hunt did not ask to schedule a time to meet with Plaintiff, Dkt. # 25 at ¶2, and Greimel did not state that Plaintiff wanted to meet with GHS staff to tell his side of the story. *Id.* at 66. Plaintiff later testified that if GHS or District administrators had given him an opportunity to explain himself, he is certain that he would have met with them. Dkt. # 24 at 2.

In a declaration submitted in connection with the pending motions, Plaintiff stated he intended to finish high school at GHS before being expelled. Dkt. # 24 at 6, 8 ("[e]ven after I was arrested and released, I fully intended to put this behind me and wanted to get back to school" and that "I would have come back to [GHS] if the school had made things right by following its own rules"). But in his deposition, Plaintiff testified:

> I didn't go back to [GHS] after the break of my own volition. I was unaware of an emergency expulsion for a while. I don't know exactly how long that was, but I remember the first days of being, you know, technically able to go to [GHS] and deciding not to, it being my own choice not to go.

---

[6] Plaintiff does not separately analyze the emergency and long-term expulsions, but Defendants do, and the Court considers the expulsions separately as well.

[7] Hunt testified that she intended to call Greimel to schedule a reengagement meeting to discuss Plaintiff's version of the events with Plaintiff and his family. Dkt. # 54 at 66. But Hunt did not say she ever offered to schedule a reengagment meeting, either that day over the phone or any time prior to May 10, 2018. *Id.*; Dkt. # 25 at ¶¶ 2–3; Dkt. # 23-1 at 92–93.

ORDER - 5

Dkt. # 54 at 80.

C.     Long-Term Expulsion

At GHS, the assistant principal, Hunt, addressed whether to impose a long-term suspension and expulsion ("long-term expulsion"). Dkt. # 23-5 at 4. On Monday, February 26, security officer Kwajalein Griffin collected student incident statements from Cohen and Engal, Plaintiff's remaining tablemates, about Plaintiff's prior in-class statements. Dkt. # 54 at 41–42. Their statements tracked those of Jenkins.[8] *See* Dkts. ## 23-2 at 79–80, 23-3 at 6, 8. That week, Hunt also met with GHS administrators, counselors, the discipline department, and District staff to determine whether to issue a long-term expulsion. Dkt. # 54 at 42. After the mid-winter break, Plaintiff did not return to GHS. Dkt. # 54 at 80 ("I didn't go back to [GHS] after the break of my own volition."). On March 1, Hunt sent Plaintiff notice that the District had decided to impose a long-term expulsion. Dkt. # 23-5 at 64; Dkt. # 23-6 at 28.

D.     Plaintiff's Appeal

On Monday, February 26, Dana Brown, Plaintiff's attorney, sent the District a notice of Plaintiff's intent to appeal his emergency expulsion. Dkt. # 20-3 at 25. Brown understood that a hearing was "supposed to be scheduled within 3 school business days from the day the appeal was received." *Id.* at 24. But Brown informed the District that for Plaintiff's hearing, she needed to ensure she first receive from the District a copy of Plaintiff's school file and the materials the District intended to present to sufficiently prepare, and that there was also an ongoing criminal investigation. *Id.*; *see* Dkt. # 23-6 at 28. In March and April, Brown and the District's counsel corresponded via email to schedule Plaintiff's hearing. Dkt. # 20-3 at 26–30.

---

[8] There is one inconsistency. Engal asserted that it was on a later date that Plaintiff threatened a tablemate, saying they were "on the top of his 'list'"; while Jenkins and Cohen said this threat occurred at the time of Plaintiff's alleged threat to shoot students after pulling the fire alarm. Dkt. # 23-3 at 4, 6, 8.

ORDER - 6

On April 19, Brown and the District scheduled the hearing for May 10. *Id.* at 32. Plaintiff never objected to the hearing's scheduling outside the District policy's three-day timeline.

On May 10, Plaintiff's appeal hearing was held before a District hearing officer. Dkt. # 20-3 at 36–43. The hearing addressed both expulsions. The hearing officer acknowledged that GHS's decision to emergency expel Plaintiff took place because GHS administrators "had information that threats were made at school regarding harm to GHS students when coupled with the snapchat post." *Id.* at 43. But the hearing officer reversed the emergency expulsion and the long-term expulsion, finding that GHS did not prove by a preponderance of the evidence that Plaintiff committed "credible" or "focused" threats of violence. *Id.*

E.     Procedural History

On December 3, 2021, Plaintiff filed his first amended complaint, asserting two causes of action: (1) a claim under 42 U.S.C. § 1983 for violation of procedural due process[9]; and (2) a claim for negligence.[10] Dkt. # 11 at 8–10. For the first claim, Plaintiff says Defendants violated his right to a free public education by not affording him due process before Defendants expelled him from GHS. *Id.* at ¶¶ 43–53. As to the second, Plaintiff says Defendants owed Powers a duty to investigate his conduct at school before informing the GHS community. *Id.* at ¶ 57. Plaintiff alleges Defendants breached this duty by not following the school district's policies and procedures and then "disseminating harmful information about [Plaintiff] to the Garfield community, students, and parents." *Id.* at ¶¶ 58–59.

---

[9] Plaintiff clarifies that he only brings a procedural due process claim. Dkt. # 26 at 17; *see* Dkt. # 11 at ¶¶ 43–53. Thus, the Court does not consider any substantive due process claim.

[10] Plaintiff's first amended complaint includes a claim for negligent infliction of emotional distress ("NIED"), but Plaintiff did not mention this claim in his summary judgment motion or in response to Defendants' motion seeking dismissal of the claim. Plaintiff has thus abandoned his NIED claim. *See Seaway Properties, LLC v. Fireman's Fund Ins. Co.*, 16 F. Supp. 3d 1240, 1252 (W.D. Wash. 2014) (ruling that plaintiff abandoned its negligence claim by not mentioning that claim in response to the defendant's summary judgment motion).

ORDER - 7

Defendants move for summary judgment on both claims. Dkt. # 20. Plaintiff moves for partial summary judgment as to both claims, requesting that the Court leave for the factfinder on the question for damages for the negligence claim. Dkt. # 22.

### III.
#### ANALYSIS

A.      Summary Judgment Standard

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A fact is material if it affects the case's outcome. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986). A dispute of material fact is genuine if the evidence is such that reasonable persons could disagree about whether the facts claimed by the movant are true. *Aydin Corp. v. Loral Corp.*, 718 F.2d 897, 902 (9th Cir. 1983).

"[W]hen simultaneous cross-motions for summary judgment on the same claim are before the court, the court must consider the appropriate evidentiary material identified and submitted in support of both motions, and in opposition to both motions, before ruling on each of them." *Fair Hous. Council of Riverside Cnty., Inc. v. Riverside Two*, 249 F.3d 1132, 1134 (9th Cir. 2001). If the moving party bears the burden of proof on a claim, it "must show that the undisputed facts establish every element of the claim." *Chiron Corp. v. Abbott Lab'ys*, 902 F. Supp. 1103, 1110 (N.D. Cal. 1995). "Where the non-moving party bears the burden of proof at trial, the moving party need only prove that there is an absence of evidence to support the non-moving party's case." *In re Oracle Corp. Sec. Litig.*, 627 F.3d 376, 387 (9th Cir. 2010). Then, the non-moving party bears the burden of designating "specific facts demonstrating the existence of genuine issues for trial." *Id.*

B.  Procedural Due Process

The Fourteenth Amendment states that the government may not deprive persons of "life, liberty, or property" without "due process of law."  U.S. CONST. amend. XIV, § 1.  A Section 1983 claim based on procedural due process requires: "(1) a liberty or property interest protected by the Constitution; (2) a deprivation of the interest by the government; (3) lack of process." *Portman v. Cnty. of Santa Clara*, 995 F.2d 898, 904 (9th Cir. 1993).  Property interests are "defined by reference to state law."  *Id.*

Defendants do not address whether Plaintiff was deprived of a constitutionally protected property interest; therefore, the Court assumes that this element is undisputed.  In any event, Washington courts have implicitly recognized that state law vests students with a property interest in public education.  *See Seattle Sch. Dist. v. State*, 90 Wash.2d 476, 513, 585 P.2d 71 (1978) (construing WASH. CONST. art. IX, § 1 as imposing a duty on the State to provide and finance public education and a corollary "right" of students to such schooling).  Once a state provides children the right to a public education, the Fourteenth Amendment protects students against deprivation of that entitlement without due process of law.  *Goss*, 419 U.S. at 574

The question then becomes whether Defendants employed adequate procedures to protect Plaintiff's interests with respect to his emergency expulsion and long-term expulsion.

1.  Emergency Expulsion

For students facing a suspension or expulsion of ten days or less, due process requires that schools provide the student "oral or written notice of the charges against [them] and, if [they] deny them, an explanation of the evidence the authorities have and an opportunity to present his side of the story."  *Id.* at 581.  Generally, notice and hearing should precede removal of the student from school, but "[s]tudents whose presence poses a continuing danger to persons or property or an ongoing threat of disrupting the academic process may be immediately

removed from school." *Id.* at 582. In those instances, "the necessary notice and rudimentary hearing should follow as soon as practicable." *Id.* at 582–83. There does not appear to be applicable legal authority defining the phrase "as soon as practicable."

Plaintiff does not appear to dispute that the circumstances surrounding Plaintiff's alleged threats—which escalated to a police investigation and arrest for felony harassment on February 16, 2018—created an emergency under *Goss* that permitted Defendants to remove him from school before providing process. *See, e.g., Hess v. Bd. Of Trustees of S. Illinois Univ.*, 839 F.3d 668, 674 (7th Cir. 2016) (immediate removal of Plaintiff from school pending a later hearing was justified, since he was subject to an arrest warrant for aggravated battery); *C.Y. ex rel. Antone v. Lakeview Pub. Sch.,* 557 F.App'x 426, 431 (6th Cir. 2014) ("it would not have violated due process for Huber to suspend C.Y. over the phone on the 21st. Huber had received reports that C.Y. intended to stab A.B. in a fight after school that day . . . Under the circumstances, it would have been reasonable for Huber to direct C.Y. not to return to school until Huber had the opportunity to meet with her."). Because Plaintiff was not at school due to illness on February 16, 2018, which happened to be a Friday before a week-long break, Defendants did not need to immediately remove Plaintiff from school. Further, the week-long break allowed Defendants to give notice of the expulsion on February 22, 2022—both orally in the form of a call to Plaintiff's mother and written in the form of a mailed Notice of Disciplinary Action—four days before the beginning of the expulsion period. Dkt. # 25; Dkt. # 23-3 at 11.

        a.       Notice

Plaintiff does not appear to dispute that he received notice of the emergency expulsion. And as discussed above, Defendants provided notice of Plaintiff's expulsion on February 22, 2018, when they called Plaintiff's mother. Dkt. # 25. The same day, Hunt mailed the NDA to

ORDER - 10

Plaintiff, informing Plaintiff of his emergency expulsion and identifying the charges against him. Dkt. # 23-3 at 10–11.

          b.      Opportunity to be heard

The "rudimentary hearing" required by *Goss* need not be a formal hearing. *Goss*, 419 U.S. at 582. "All that *Goss* required was an 'informal give-and-take' between the student and the administrative body dismissing him that would, at least, give the student 'the opportunity to characterize his conduct and put it in what he deems the proper context.'" *Bd. of Curators of Univ. of Missouri v. Horowitz*, 435 U.S. 78, 85–86 (1978) (quoting *Goss*, 419 U.S. at 581). For an emergency expulsion, this rudimentary hearing must occur "as soon as practicable." *Goss*, 419 U.S. at 582–83.

With respect to the opportunity to be heard, the parties focus on the appeal. The NDA sent to Plaintiff on February 22, 2018, informed him of his right to appeal his emergency expulsion and the procedures for requesting an appeal. Dkt. # 23-3 at 11. On Monday, February 26, Plaintiff's attorney, Dana Brown, filed a notice of appeal and acknowledged how normally such an appeal would be scheduled within three school days. *See* WAC 392-400-285 (repealed 2019) (2018 regulation requiring a hearing within three school business days of a notice of appeal). But Brown indicated that she wanted to delay the hearing "to make sure [she had] all the materials [she] requested so that [she could] prepare for the hearing." Dkt. # 20–3 at 24. She also noted that there was a pending criminal investigation at the time. *Id.* Due to scheduling conflicts between Brown and the District, the hearing did not occur until May 10, 2018. Dkt. # 20–3 at 36–43.

Defendants argue that Plaintiff waived any time-based procedural due process arguments because his attorney delayed the hearing. Dkt. # 20 at 18. They cite *Correa v. Nampa Sch. Dist. No. 131,* 645 F.2d 814, 816–17 (9th Cir. 1981), a Ninth Circuit case in which a school district

ORDER - 11

employee was found to have "waived her right to claim a due process violation because she knowingly and voluntarily chose to forego the District's administrative procedures." This case is distinguishable from *Correa* because Plaintiff simply requested a delay in the hearing and did not suggest that he wished to forgo the hearing entirely. Dkt. # 20–3 at 24. Given Plaintiff's request to delay the hearing, questions remain on whether the District did enough to comply with *Goss*. For example, Plaintiff argues that Defendants should have made more efforts to speak with Plaintiff before May 10, and that Plaintiff never refused to participate in a conversation with Defendants about his side of the story. Dkt. # 22; Dkt. # 23–1 at 44. In contrast, Defendants claim that "Counsel never made Plaintiff available for a threat assessment or other meeting to provide his version of the events until that appeal hearing." Dkt. # 20 at 19. The question remains whether the May 10, 2018 hearing was held "as soon as practicable" given the circumstances, including whether the District made sufficient efforts to work with Plaintiff's counsel about scheduling and whether the delay was caused in part by the time it took for Defendants to send relevant documents to Plaintiff's counsel. *See, e.g.*, Dkt. # 20–3 at 24. Lastly, the factfinder must decide whether the hearing itself provided Plaintiff with an adequate opportunity to "characterize his conduct and put it in what he deems the proper context." *Bd. of Curators of Univ. of Missouri*, 435 U.S. at 85–86.

      Thus, summary judgment is inappropriate for either side as to whether Defendants provided due process during and after Plaintiff's emergency expulsion.

2.      Long-term Expulsion

The parties do not contend that Plaintiff's long-term expulsion was in response to an emergency. Thus, Defendants needed to provide Plaintiff notice and an opportunity to be heard before imposing the long-term expulsion.[11]

a.      Notice

Defendants mailed Plaintiff the NDA for the emergency expulsion on February 22, and Defendants imposed the long-term expulsion on March 1. Dkt. # 23-3 at 10–11; Dkt. # 23-5 at 64. It is undisputed Plaintiff received the NDA before Defendants imposed the long-term expulsion. The NDA stated, "Student placed on emergency expulsion for 10 days pending investigation about threat made to school. Waiting on police report to review and determine final discipline decision." *Id.* It also stated the charges—"Threats of Violence"—against Plaintiff. *Id.* The parties do not suggest that the charges against Plaintiff differ between the emergency expulsion and the long-term expulsion. The plain language of the NDA forecasted that Defendants considered imposing further discipline when the emergency expulsion expired. *See Keough v. Tate Cnty. Bd. of Educ.*, 748 F.2d 1077, 1081 (5th Cir. 1984) (finding that because "a ten-day suspension had already been imposed, it [was] readily apparent that [the plaintiff's parents] were informed that more sanctions were possible"). Thus, Defendants provided Plaintiff sufficient notice of the charges against him before imposing the long-term expulsion.

---

[11] For suspensions or expulsions longer than ten days, greater process may be necessary. *See Goss*, 419 U.S. at 584 ("[W]e have addressed ourselves solely to the short suspension, not exceeding 10 days. Longer suspensions or expulsions for the remainder of the school term, or permanently, may require more formal procedures"). Since *Goss*, the Supreme Court has not identified what process is due for suspensions or expulsions exceeding ten days. *See Watson ex rel. Watson v. Beckel*, 242 F.3d 1237, 1240 (10th Cir. 2001) ("The Supreme Court has not answered the question of what, if any, additional process is required for a long-term suspension or expulsion"); *Newsome v. Batavia Local Sch. Dist.*, 842 F.2d 920, 923 (6th Cir. 1988) (observing that the Supreme Court "has specifically left open the question of what process is due in long-term suspensions (suspensions exceeding ten days) and expulsion cases").

ORDER - 13

    b.  Opportunity to be heard

  Although the emergency expulsion expired on March 9, Defendants issued Plaintiff's long-term expulsion on March 1. Dkt. # 23-5 at 64. The parties do not dispute that Plaintiff denied the charges against him for the long-term expulsion because his attorney filed a notice of appeal the emergency expulsion on February 26. Dkt. # 20-3 at 25. Thus, Plaintiff was entitled to "an explanation of the evidence the authorities have and an opportunity to present his side of the story" before his long-term expulsion on March 1, 2018. *Goss*, 419 U.S. at 581.

  In *Goss*, the Supreme Court was concerned with fairness. 419 U.S. at 581 ("The student's interest is to avoid unfair or mistaken exclusion from the educational process, with all of its unfortunate consequences."). "[I]t would be a strange disciplinary system in an educational institution if no communication was sought by the disciplinarian with the student . . . to let him tell his side of the story in order to make sure that an injustice was not done." *Id.* at 580. For the student to explain his version, the student must "be told what he is accused of doing and what the basis of the accusation is." *Id.* at 582.

  The parties do not dispute that, before March 1, 2018, Defendants did not ask Plaintiff, either directly or through his attorney, to provide his version of the events. Dkt. # 24 at ¶4; Dkt. # 23-1 at 44, 88 (asserting that no GHS administrator ever spoke with Plaintiff about his alleged threats until his hearing on May 10, 2018). Defendants also did not provide Plaintiff the basis of the charges against him, either through copies of the other students' statements or any explanation of the evidence informing Defendants' decision to impose the long-term expulsion. Dkt. # 23-6 at 37–38; Dkt. # 24 at ¶4. Defendants provided Plaintiff's attorney only with the evidence Defendants relied on to convert his emergency expulsion to a long-term expulsion on March 12—11 days after Defendants imposed the long-term expulsion. Dkt. # 23-1 at 59–60; Dkt. # 23-2 at 68; Dkt. # 23-5 at 47–49.

ORDER - 14

  Again, Defendants say that Plaintiff waived any time-based procedural due process argument because Plaintiff's attorney delayed the hearing, citing *Rosa R. v. Connelly*, 889 F.2d 435 (2d Cir. 1989). In that case, a high school student was suspended for ten days for bringing a loaded gun to school. *Id.* at 436. During the suspension, the superintended scheduled an expulsion hearing, to which the student and his attorney twice postponed. *Id.* The student had an opportunity to present his case during an initial hearing before the school board and an opportunity to appeal the school board's decision from that hearing before imposing a 180-day expulsion. *Id.* at 437–39. In choosing not to appeal the decision, the court noted: "[t]hat appellants and their attorney chose not to avail themselves of these state remedies does not mean they were denied adequate due process." *Id.* at 439. But *Connelly* is distinguishable because there, the school provided multiple opportunities for the student to present his version of the events, along with hearing postponements, before expelling the student for 180 days. In this case, Defendants did not offer Plaintiff an opportunity to tell his side of the story before imposing the long-term expulsion.

  Defendants say they offered Plaintiff an opportunity to be heard about the long-term expulsion during his appeal hearing for the emergency expulsion, and that Defendants acted reasonably considering Plaintiff's counsel requested a delay. But Defendants cite no authority that suggests they could impose additional discipline, the long-term expulsion, before providing Plaintiff an opportunity to be heard. Defendants also say that Plaintiff's attorney "never made or offered to make Plaintiff available to tell his side of the story until the appeal hearing." Dkt. # 20 at 16. Defendants cite no authority suggesting that the student must contact the school to schedule such a meeting. There appears to be no basis to infer this requirement. And there is no evidence that Defendants communicated with Plaintiff to hear his side of the story before the appeal.

One case cited by both parties is instructive: *T.T. v. Bellevue Sch. Dist.*, No. C08-0365-JCC, 2009 WL 816961, at *1 (W.D. Wash. Mar. 24, 2009), *aff'd in part, rev'd in part on other grounds*, 376 F. App'x 769 (9th Cir. 2010). There, T.T., a high school student, brought a civil rights action against the school district asserting that his emergency expulsion and long-term suspension violated his procedural due process rights. *Id.* The student said a due process violation occurred when the school converted T.T.'s emergency expulsion into a long-term suspension without notice or an opportunity to be heard. *Id.* at *6. As to opportunity to be heard, the court disagreed with T.T. because shortly after the school imposed the emergency expulsion, the school and T.T. scheduled both a later hearing on the emergency expulsion and a more immediate informal meeting between the school, T.T., and his family. *Id.* During this meeting, the school gave T.T. an opportunity to discuss his record of misconduct and suspensions and explain his version of the events. *Id.* After the meeting, the school converted the emergency expulsion into a long-term suspension. *Id.* The court held that T.T. had an adequate opportunity to be heard before the school imposed the long-term suspension. *Id.* at *6–*7. But here, Defendants failed to provide Plaintiff an opportunity to be heard because there was not even an informal discussion between Defendants and Plaintiff before Defendants issued the long-term expulsion. Defendants present no evidence to create a material issue of fact on this part of Plaintiff's claim.

          c.     Substantial prejudice

Defendants say summary judgment is improper because there is no proof of substantial prejudice. They rely on *Keough v. Tate Cnty. Bd. of Educ.*, 748 F.2d 1077, 1078 (5th Cir. 1984). *Keough* involved a high school student subject to a short-term and long-term suspension. *Id.* The student filed a Section 1983 alleging a violation of procedural due process. *Id.* The student argued on appeal that the district court erred in considering his guilt or innocence. *Id.* at 1083.

ORDER - 16

The *Keough* court noted, "[t]o establish a denial of procedural due process, a party must show substantial prejudice." *Id.* The court concluded that the student could not show substantial prejudice because he admitted to the charges against him; his guilt was "relevant in determining substantial prejudice or harm." *Id.*

Defendants cite no authority suggesting the Ninth Circuit requires proof of substantial prejudice. And the Supreme Court in *Goss* did not mandate showing substantial prejudice. But other circuits agree with *Keough*. *See Watson*, 242 F.3d at 1242 (for public school student to establish denial of due process for long-term suspension, student must show substantial prejudice).

Regardless, Defendants say that Plaintiff was not prejudiced by any deprivation of due process because he decided to not return to GHS after being emergency expelled. Dkt. # 54 at 80 ("I did not go back to [GHS] after the break of my own volition."). But Plaintiff also submitted a declaration stating that he wished to finish high school at GHS. Dkt. # 24 at 6, 8 (stating that "[e]ven after I was arrested and released, I fully intended to put this behind me and wanted to get back to school" and that "I would have come back to [GHS] if the school had made things right by following its own rules"). His pursuit of the appeal also tends to show that he wished to return. The record is inconsistent. Thus, there is an issue of fact as to whether Plaintiff demonstrated substantial prejudice. But the Court is not holding at this time that such a requirement applies.

C.      Negligence

In Washington, the elements of negligence are: "(1) the existence of a duty owed to the complaining party; (2) a breach thereof; (3) a resulting injury; and (4) a proximate cause between the claimed breach and resulting injury." *Pedroza v. Bryant*, 101 Wash. 2d 226, 228, 677 P.2d 166 (1984). The threshold question of whether the defendant owes a duty to the plaintiff is a

ORDER - 17

question of law. *Fuentes v. Port of Seattle*, 119 Wash. App. 864, 868, 82 P.3d 1175 (2003). Breach and proximate cause are normally issues decided by the jury, but they may be determined as a matter of law when "reasonable minds could not differ" on whether those elements exist. *Turner v. Washington State Dep't of Soc. & Health Servs.*, 198 Wash.2d 273, 295, 493 P.3d 117 (2021) (quoting *Hertog v. City of Seattle*, 138 Wash.2d 265, 275, 979 P.2d 400 (1999)).

The parties do not appear to dispute that school districts and administrators owe some duty of care to their students. *See Miller v. Monroe Sch. Dist.*, 159 F. Supp. 3d 1238, 1254 (W.D. Wash. 2016).

Neither side is entitled to summary judgment as to negligence because there remain issues of fact as to causation.

Proximate cause requires cause in fact and legal causation. *Albertson v. State*, 191 Wash. App. 284, 296, 361 P.3d 808 (2015). "Cause in fact refers to the 'but for' consequences of an act—the physical connection between an act and an injury." *Wuthrich v. King Cnty.*, 185 Wash. 2d 19, 28, 366 P.3d 926 (2016) (quoting *Hartley v. State*, 103 Wash.2d 768, 778, 698 P.2d 77 (1985)). Legal causation requires a district court to consider "logic, common sense, justice, policy, and precedent" when deciding how far the consequences of a defendant's wrongful acts should extend. *Hartley*, 103 Wash.2d at 778.

Defendants say their conduct was not the cause in fact of Plaintiff's injuries because Plaintiff cannot establish a causal link between Defendants' conduct and Plaintiff's injuries. As to injuries, Plaintiff submits evidence of damage to his mental health. *See* Dkt. # 24 at ¶ 10 (Plaintiff "suffered from severe depression and anxiety"). Plaintiff also submits an expert report written by Dr. Kenneth Muscatel. Dkt. # 27. In characterizing Plaintiff's expulsion, Dr. Muscatel notes: "[T]he trauma he experienced at the time and the pervasive dislocation and trauma he suffered after the events of 2-16-2018 . . . caused estrangement and loss from [his

ORDER - 18

peers] and resulted in his being seen (in his mind) . . . as a disturbed, undesirable and potentially dangerous adolescent." Dkt. # 27-2 at 45. Dr. Muscatel observed that Plaintiff's "greatest trauma was not . . . his immediate experience and treatment by [SPD], but in how events transpired following his arrest." *Id.* at 44. Plaintiff elaborated: "There is not a day that goes by that I don't think about the school's actions and feel betrayed, hopeless, anxious, angry, and irreparably harmed as well as completely robbed of my innocence." Dkt. # 24 at ¶ 9. Plaintiff has raised an issue of fact as to whether Defendants' alleged breach of duty was the cause in fact of his injuries.

Defendants counter that Plaintiff's damages resulted from superseding causes, and that his claimed injuries would have occurred even if Defendants had not committed the alleged breach. Dkt. # 20 at 22–23. Defendants contend that SPD's decision to arrest Plaintiff and the resulting criminal investigation, both of which received media attention, caused Plaintiff's injuries. Dkt. # 54 at 75–79. *See id.* at 69 (Information filed by the King County Prosecuting Attorney's office). Defendants explain that although Principal Howard decided to call SPD, at least one GHS parent independently reported Plaintiff's alleged threats to SPD based on their child's account of the events. With respect to Plaintiff's motion for summary judgment, the Court must look at the evidence and all reasonable inferences therefrom in the light most favorable to Defendants. In doing so, the Court concludes it cannot rule as a matter of law on this element in Plaintiff's favor. Thus, summary judgment is inappropriate for either side as to causation and thus the negligence claim.[12]

---

[12] Given the conclusion above, the Court need reach the issue breach. However, there also appear to be issues of fact as to this element precluding summary judgment. Plaintiff focuses on Defendants' alleged violations of state regulations applicable to public schools and District policies. He says these violations include failing to give Plaintiff an opportunity to share his version of the events before the long-term expulsion, failing to timely mail Plaintiff the NDA, failing to fill out a threat worksheet or

# V.

## Conclusion[13]

In conclusion, the Court DENIES Defendants' motion. The Court GRANTS in part and DENIES in part Plaintiff's motion. The Court GRANTS Plaintiff's motion with respect to Plaintiff's due process claim regarding the long-term expulsion. The motion is denied in all other respects.

Dated this 5th day of October, 2022.

John H. Chun
United States District Judge

---

[cont.] threat assessment referral form, and failing to schedule a reengagement meeting, among others. Dkt. # 22 at 24. Regulatory violations and a failure to follow internal policies constitute evidence of negligence but are not necessarily conclusive proof of negligence. *See* RCW 5.40.050 ("A breach of a duty imposed by statute, ordinance, or administrative rule shall not be considered negligence per se, but may be considered by the trier of fact as evidence of negligence."); *McKinney v. State of Washington, Dep't of Soc. & Health Servs.*, No. C05-691JLR, 2006 WL 1319454, at *1 (W.D. Wash. May 11, 2006) (failure to follow internal policies can be evidence of negligence). Defendants counter that because of SPD's investigation and Plaintiff hiring an attorney, Defendants could not "reasonably [have been] expected to obtain Plaintiff's version of the events." Dkt. # 20 at 21. As to the NDA, Defendants say that Hunt spoke with Plaintiff's mother during the school break, thereby satisfying the requirement to meet with the student's family before the next-school-day deadline. *See* RCW 28A.600.010(2). For the threat assessment, Defendants assert they could not perform one because Plaintiff had instructed the District to communicate exclusively through his attorney. Dkt. # 54 at 58, 65. Defendants also say they were not required to schedule a reengagement meeting before Plaintiff's appeal because Plaintiff was subject to a long-term expulsion, meaning his return to school was not imminent. Dkt. # 23-5 at 64; Dkt. # 23-6 at 28.

[13] Plaintiff moves to strike four categories of material: (1) an email Howard sent on February 17, 2018, Dkt. # 54 at 19; (2) emails from concerned students and parents after Plaintiff's emergency expulsion, Dkt. # 54 at 21, 85–86; (3) a summary of opinions from Defendants' expert Dr. Kurt Hatch, Dkt # 20-3 at 53–60; and (4) a probable cause certification produced by SPD, Dkt. # 54 at 70–71. Plaintiff says the emails are hearsay and irrelevant, Dr. Hatch's report is not sworn under penalty of perjury, and the probable cause certification is irrelevant. Dkt. # 26 at 14–17. The Court denies this request without prejudice. These portions of the record did not affect the Court's analysis with respect to any of the issues before the Court. Should Plaintiff wish to object to the admissibility of these documents at a later stage, he may do so.